```
                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF RHODE ISLAND
```

_____
                                   )
JOHN DUNBAR,                       )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )    C.A. No. 24-251 WES
                                   )
PROVIDENCE COLLEGE,                )
                                   )
        Defendant.                 )
_____)

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Senior District Judge.

Plaintiff John Dunbar sues Defendant Providence College (the "College"), seeking relief on claims of alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"); Rhode Island's Fair Employment Practices Act ("FEPA"); and Rhode Island's Civil Rights Act of 1990 ("RICRA"). Compl., Dkt. No. 1. Before the Court is the College's Motion to Dismiss (the "College's Motion"), Dkt. No. 10. For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART the College's Motion.

I.  **BACKGROUND**

Dunbar's Complaint alleges as follows. Dunbar, who is Black, serves as the third highest ranking officer in the College's Public Safety Department (the "Department").[1] Compl. ¶¶ 9-10. From 2015

---

[1] Dunbar's Complaint states that he is the second highest ranking officer in the College's Public Safety Department, but

through 2022, the College subjected him to "workplace discrimination on the basis of his race and color and retaliated against him for complaining about his discriminatory work environment." Id. ¶ 12.

### 2015 Allegations

On May 27, 2015, Dunbar emailed Jack Leyden, the College's then-Director of Public Safety and Department Chief, regarding alleged acts of racial discrimination by Dunbar's supervisor, Deputy Chief Eric Croce. Id. ¶ 13. Dunbar does not state what those acts were or what came of his email.

Also in 2015, an outside firm reviewed the Department and recommended, among other things, that Dunbar be promoted and given more job duties. Id. ¶ 14. Chief Leyden "became upset" about the recommendations, especially as to Dunbar's promotion. Id.

### 2017 Allegations

In 2017, the College promoted Dunbar. Id. ¶ 15. "[S]everal of [Dunbar's] coworkers expressed their beliefs to him that he was only promoted due to his race." Id. And one coworker "verbally harassed [him] by accusing him of starting a rumor . . . ." Id.

### 2018 Allegations

In spring 2018, Department Interim Chief Koren Kanadanian

---

Dunbar later clarified that he is the third highest ranking officer. Compl. ¶ 10, Dkt. No. 1; Dunbar's Opp'n Coll.'s Mot. Dismiss 5-6 n.1, Dkt. No. 12.

stripped Dunbar of some supervisory duties. Id. ¶ 16. Later, that September, Interim Chief Kanadanian further reduced Dunbar's work duties. Id. ¶ 17. And in the fall, Chief Leyden also prohibited Dunbar from attending a campus "solidarity walk," which was another of Dunbar's assignments.[2] Id. ¶ 18.

### 2019 Allegations

In April 2019, Dunbar emailed the College's Executive Vice President and Treasurer about his "concerns with Interim Chief Kanadanian's candidacy" to become Chief of the Department. Id. ¶ 20. Dunbar raised allegations of racism in the Department and his opinion that Interim Chief Kanadanian contributed to the problem. Id. In response, the College stated that it planned to move forward with its decision to promote Interim Chief Kanadanian. Id. ¶ 21. Later, in August, Dunbar was appointed as Internal Affairs Investigator. Id. ¶ 22.

In November, Dunbar "took a medical leave of absence due to the stress and anxiety caused from the discriminatory work environment at [the College]." Id. ¶ 23. Dunbar remained out of work for about five months. Id.

### 2020 Allegations

In summer 2020, Dunbar "called attention" to a group of

---

[2] Dunbar does not clarify the relationship and division of authority at this point between Interim Chief Kanadanian and Chief Leyden.

students who were posting to social media their negative encounters with the Department and were using the hashtag "#BlackatPC." Id. ¶ 24. "After [he] called attention to the social media posts, there was an uproar" in the Department, and Chief Kanadanian banned Dunbar from using the Department's social media accounts. Id. Also, during that summer, a coworker allegedly told Dunbar that Dunbar's "2005 complaint against him for making a racist remark had been removed from his file." Id. ¶ 25.

That October, Dunbar and another officer were involved in an incident with a student: The student, acting erratically, called Dunbar by a derogatory racial slur and bit the other officer. Id. ¶ 27. In response, Deputy Chief Croce "failed and/or refused to comment" on the racial slur and only expressed concern for the other officer's injury. Id.

On November 10, Dunbar met with representatives from the HR Department to air his concerns about Deputy Chief Croce and "to discuss the racially hostile work environment." Id. ¶¶ 28-31. Among other concerns, he shared that he did not have a working personal printer, even though "all Caucasian Public Safety supervisors had [one]." Id. ¶ 31. But the HR Department representatives took no additional steps to investigate his claims and instead "questioned why he had been video-taping the supervisor office in [the Department]." Id.

That November, Dunbar took another "medical leave of absence

4

due to the stress and anxiety caused from the discriminatory work environment at [the College]." Id. ¶ 33.  He again stayed out of work until the following March.  Id.  While Dunbar was out, Deputy Chief Croce took away his assignment as Internal Affairs Investigator.  Id. ¶ 22.

### 2021 Allegations

On March 21, the Department opened an investigation into Dunbar's alleged failure to answer radio calls during a March 20 overnight shift.  Id. ¶ 34.  On the 23rd, Deputy Chief Croce "unofficially demoted" Dunbar by sending others a document that listed Dunbar as subordinate to a lower ranking colleague.  Id. ¶ 35.

On April 16, Dunbar met with Deputy Chief Croce about an error Dunbar made on his overtime sheet.  Deputy Chief Croce did not believe that the mistake was an accident and "accused Dunbar of committing fraud and told him that he could be arrested."  Id. ¶ 37.  The next week, "Deputy Chief Croce yelled at another Public Safety Officer for making an error on his overtime sheet but did not threaten him with arrest."  Id.

On May 21, Dunbar emailed Deputy Chief Croce to again express concern "regarding the discriminatory work environment."  Id. ¶¶ 38-39.  Deputy Chief Croce then met with Dunbar.  Id. ¶ 39.  Afterwards, Dunbar emailed Deputy Chief Croce to say that Deputy Chief Croce's "demeanor" and "remarks" during their discussion

5

made him "nervous and concerned," and that he felt "uncomfortable." Id. ¶ 40.  Dunbar also asked to speak with a different representative from the College.  Id.  Dunbar does not say whether anything came of this email.

In a September Department weekly meeting, Deputy Chief Croce reviewed an incident where a student called a Black Providence Police Officer by a racial slur.  Id. ¶ 41.  When reviewing the incident report, Deputy Chief Croce repeated the slur aloud.  Id.

### 2022 Allegations

In January 2022, Dunbar reached out to a College representative to express concern that "Deputy Chief Croce was regularly hiring Caucasian employees" to the Department, while Dunbar was the only Black male in the Department.  Id. ¶ 42.

### Undated Allegations

Overall, Dunbar has been "ostracized" and "ousted from the chain of command."  Id. ¶ 43.  Subordinate officers ignore him; he has been stripped of some job duties; and he has been excluded from joining certain campus events.  Id.  And "[o]n four (4) separate occasions [Dunbar] has been racially profiled, harassed and/or refused entry onto [the College's] campus by" a white co-worker.  Id. ¶ 44.

\* \* \*

"On or about April 26, 2022," Dunbar filed charges of discrimination against the College with the Equal Employment

6

Opportunity Commission ("EEOC") and the Rhode Island Commission for Human Rights ("RICHR").  Id. ¶ 5.  After receiving right to sue letters in March and April of 2024, he commenced this lawsuit.  Id. ¶¶ 7-8.

The College now seeks to dismiss Dunbar's claims under Federal Rule of Civil Procedure 12(b)(6).  Coll.'s Mot. 1.

## II. DISCUSSION

### A. Legal Standard

To withstand a motion to dismiss, the Complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face."  Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013) (quoting Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012)).  To determine whether a complaint states a facially plausible legal claim, the Court first "sift[s] through the averments in the complaint," and "separat[es] conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited)."  Id. (citing Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2024)).  Next, the Court determines whether the remaining factual content "gives rise to a plausible claim to relief."  Id. (citing Morales-Cruz, 676 F.3d at 224).

For discrimination and retaliation claims like Dunbar's, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim[s]."  Id. at 54.  But Dunbar

7

"need not plead facts sufficient to establish a prima facie case." Id. Indeed, his Complaint "need not [show] a one-to-one relationship between any single allegation and a necessary element of the cause of action. What counts is the 'cumulative effect of the complaint's factual allegations.'" Id. at 55 (brackets omitted) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11 (2002).

**B. Dunbar's Complaint**

Dunbar's Complaint unfolds in three counts. In Count One, Dunbar brings claims for unlawful discrimination and retaliation under Title VII. Compl. ¶ 49. In Count Two, Dunbar repeats both claims under FEPA. Id. ¶ 50. And in Count Three, Dunbar claims only unlawful discrimination under RICRA. Id. ¶ 51.

The Court now examines Dunbar's claims, keeping in mind that he filed (1) his charges of discrimination with the EEOC and RICHR on April 26, 2022, and (2) this lawsuit on June 26, 2024. Compl. ¶ 5, 11. As a result, Title VII's 300-day filing requirement (with the EEOC) bars recovery for any unlawful employment practice that occurred prior to June 30, 2021;[3] FEPA's one-year filing

---

[3] Even though the general charge-filing requirement for Title VII claims is 180 days, that period extends to 300 days if the claimant has initially filed a claim with a state agency with authority to "grant or seek relief with respect to the alleged unlawful practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); 42 U.S.C. § 2000e-5(e)(1). Here, Dunbar

8

requirement (with the RICHR) bars recovery for any unlawful employment practice that happened before April 26, 2021; and RICRA's three-year statute of limitations (for the filing of this lawsuit) bars recovery for any unlawful employment practice that took place before June 26, 2021.  See 42 U.S.C. § 2000e-5(e)(1) (Title VII time requirement); R.I. Gen. Laws §§ 28-5-17(a), 42-112-2 (FEPA and RICRA time requirements, respectively).

For the reasons discussed below, the Court concludes that Dunbar has stated plausible claims for unlawful discrimination but not for retaliation.

### 1. Unlawful Discrimination

Title VII, FEPA, and RICRA all ban employers from treating an employee worse than others on account of race.  42 U.S.C. § 2000e-2(a); R.I. Gen. Laws §§ 28-5-7(1), 42-112-1.  Because the state courts rely on Title VII case law to analyze employment discrimination claims under FEPA and RICRA, the Court assesses Dunbar's claims together.  See DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005); Horn v. S. Union Co., 927 A.2d 292, 293-94 (R.I. 2007).

To state a prima facie case for disparate treatment in

---

notes that he "co-filed" with the EEOC and RICHR on the same day, Compl. ¶ 5; thus, while it is unclear whether Dunbar "initially filed" with RICHR, the Court assumes without deciding that Dunbar is entitled to the extended 300-day filing window.

violation of Title VII, Dunbar must allege:

> (1) he is a member of a protected class; (2) he is qualified for the job; (3) he has suffered an adverse employment action at the hands of his employer; and (4) there is some evidence of a causal connection between his membership in a protected class and the adverse employment action.

O'Horo v. Bos. Med. Ctr. Corp., 131 F.4th 1, 13 (1st Cir. 2025) (citation modified) (quoting Stratton v. Bentley Univ., 113 F.4th 25, 38 (1st Cir. 2024)). The threshold for an employment action to qualify as "adverse" is not high; an aggrieved employee need only show that the action caused an actual change in the terms or conditions of his employment. Id. at 18 (citing Muldrow v. City of St. Louis, 601 U.S. 346, 356 & n.2 (2024)). Typical examples include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Id. at 17-18 (quoting Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)).

The College contends that Dunbar fails to plausibly allege both an adverse employment action and a causal connection to his race. Coll.'s Mot. 7. It also argues that Dunbar's claims are time-barred. Id. at 14-16.

The Court recognizes that most of Dunbar's alleged discrete acts of discrimination likely do not qualify as adverse employment actions, even under the low threshold set by the Supreme Court in Muldrow. See 601 U.S. at 356 & n.2. And even if they did so

10

qualify, they are nearly all untimely.

But Dunbar argues that, collectively, he has alleged factual content adequate to support a plausible unlawful discrimination claim based on a hostile work environment. Dunbar's Opp'n Coll.'s Mot. Dismiss 9, Dkt. No. 12. Title VII recognizes a hostile work environment as a standalone adverse employment action when "the 'workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.'" O'Horo, 131 F.4th at 19 (citation modified) (quoting Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 91 (1st Cir. 2018)).

To make out a prima facie case for hostile work environment, a plaintiff must allege:

> '(1) unwelcome harassment that was (2) severe or pervasive, and (3) both objectively and subjectively offensive,' and (4) that []he was a 'member[] in a protected class, (5) that the harassment was motivated by [his membership in the class], and (6) [that there is] a basis for employer liability.'

Id. (second and fourth alterations in original) (quoting Maldonado-Cátala v. Mun. of Naranjito, 876 F.3d 1, 10 n.11 (1st Cir. 2017)). The harassment can be from a supervisor or coworker. Rae v. Woburn Pub. Sch., 113 F.4th 86, 105 (1st Cir. 2024) (citing Marrerro v. Goya of P.R., Inc., 304 F.3d 7, 26 (1st Cir. 2002)). And because claims for hostile work environment turn on "an

11

aggregation of hostile acts extending over a period of time, . . . the applicable statute of limitations will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period." O'Horo, 131 F.4th at 18-19 (quoting Cordero-Suárez v. Rodríguez, 689 F.3d 77, 82 (1st Cir. 2012)).

As noted, most of Dunbar's alleged discrete acts of discrimination are time-barred.  But under his hostile work environment theory, Dunbar can "sidestep statute-of-limitations issues" if any of the alleged racially hostile acts occurred within the relevant time period. See Brader v. Biogen, 983 F.3d 39, 59 (1st Cir. 2020) (applying Title VII's hostile work environment analysis to claims of discrimination based on disability) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120, 122 (2002)).  Such an act is known as an "anchoring act." Id. at 61.

Dunbar's Complaint contains two possible anchoring acts: (1) At a September 2021 Department meeting, Deputy Chief Croce read aloud a racial slur from a police incident report; and (2) in January 2022, Dunbar raised concerns to a College representative that Deputy Chief Croce had been hiring Caucasian employees and not Black male employees.[4]  Compl. ¶¶ 41-42.

As to the latter allegation, Dunbar complains about a general

---

[4] Dunbar also alleges undated grievances: that he has been "ostracized" and "ousted from the chain of command," excluded from

12

practice rather than an act, especially given that he does not claim to have himself been discriminated against by any hiring decision.  And while a claim that a hiring practice has a disparate impact on specific groups can serve as a valid theory of Title VII liability, Dunbar's Complaint falls far short of the standard necessary to plausibly allege such a claim.  See 42 U.S.C. § 2000e-2(k); see also Luceus v. Rhode Island, 923 F.3d 255, 257 (1st Cir. 2019) (noting that in "the usual case," disparate impact claims require "evidence of a statistical character").

That leaves only Dunbar's allegation that Deputy Chief Croce repeated a racial slur aloud when reading from a police report.  Compl. ¶ 41.  The question is whether that anchoring act plausibly "constitutes part of the same [allegedly] hostile work environment as the alleged wrongful conduct that preceded that date." Brader, 983 F.3d at 61 (quoting Maldonado-Cátala, 876 F.3d at 10).  Drawing all reasonable inferences in Dunbar's favor, the Court finds that

---

participating in certain events, and that "[o]n four (4) separate occasions [he] has been racially profiled, harassed and/or refused entry onto [the College's] campus by" a white coworker.  Compl. ¶¶ 43-44.  But Dunbar's failure to plead dates or other factual content affords no basis for the Court to reasonably infer that these specific events occurred within the relevant time periods.  See Rae v. Woburn Pub. Sch., 113 F.4th 86, 94 n.1, 108 (1st Cir. 2024) (finding, in reviewing a retaliation claim, that the plaintiff's failure to plausibly allege the timing of events along with other relevant factors "make[s] it impossible to evaluate this conclusory allegation[,]" even drawing all reasonable inferences in the plaintiff's favor).

13

it does, considering the explicitly racial nature of the incident and the involvement of Deputy Chief Croce, who is the chief antagonist in Dunbar's Complaint. See Compl. ¶¶ 13, 22, 28-31, 35-39, 42.

Because the Court finds that Dunbar plausibly alleges a qualifying anchoring act, the next question is whether that act, "in the context of" Dunbar's untimely allegations, plausibly states a claim for a hostile work environment. See Maldonado-Cátala, 876 F.3d at 12-13 (applying same framework but at summary judgment stage). In answering this question, the Court "must mull the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Id. at 10 (first quoting Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005); and then citing O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001)).

Taking Dunbar's well-pleaded allegations as true and again drawing all reasonable inferences in his favor, Dunbar's Complaint states a plausible claim for unlawful discrimination based on a hostile work environment. In all, Dunbar alleges a range of conduct from 2015 to 2022, which directly led him to complain to multiple College officials on numerous occasions and take two

14

medical leaves of absence.[5] And from the totality of his allegations, it is plausible that the complained-of actions were motivated by race. See Grajales, 682 F.3d at 49 (noting that a "paucity of direct evidence is not fatal in the plausibility inquiry. 'Smoking gun' proof of discrimination is rarely available, especially at the pleading stage" (quoting Ocasio-Hernández, 640 F.3d at 17)).

The College's counterarguments do not persuade the Court otherwise. First, the College claims that Dunbar "never makes a connection between" the alleged discriminatory acts "and any adverse employment actions taken by the College." Coll.'s Reply 5, Dkt. No. 13. This position seems to misunderstand the nature of a hostile work environment theory, which takes the creation and maintenance of a hostile work environment as an adverse employment action itself. See O'Horo, 131 F.4th at 18-19.

The College also contests Dunbar's underlying individual allegations, clearly reflecting its view that Dunbar's hostile work environment theory lacks merit. Coll.'s Reply 5-6. It urges the Court to infer that Dunbar is simply "unhappy in his

---

[5] The College asks the Court to consider evidence it argues shows that Dunbar's medical leaves of absence were unrelated to Dunbar's alleged claim of hostile work environment. See Coll.'s Mot. Ex. 1, Dkt. No. 11. But at this stage, the Court may not consider such contested evidentiary material without converting the College's Motion into a motion for summary judgment. See Newman v. Lehman Bros. Holdings, 901 F.3d 19, 25 (1st Cir. 2018).

15

employment"; that he has "not established any collegial relationships with his co-workers or superiors"; and that his allegations all "relate to his self-inflicted interpersonal conflicts and personnel issues," and "are not evidence of race-based discrimination." Id. at 6.

This argument also fails, for now. At this stage, the Court may not "attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely.'" Ocasio-Hernandez, 640 F.3d at 13 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Further, "[a]t the motion to dismiss phase in particular, '[s]ubject to some policing at the outer bounds,' the issue of whether harassment was severe or pervasive 'is commonly one of degree – both as to severity and pervasiveness – to be resolved by the trier of fact.'" Rae, 113 F.4th at 111 (alterations in original) (quoting Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002)). Whether the allegations show objectively offensive harassment is a similar question.

\* \* \*

In sum, the Court concludes that Dunbar's unlawful discrimination claims pass muster at the motion to dismiss stage. But the Court notes "that a favorable plausibility determination does not necessarily herald a likelihood of success at subsequent

stages of the litigation," when "allegations must be proven, evidence to the contrary must be factored into the mix, and the merits remain entirely open." Grajales, 682 F.3d at 50.

### 2. Retaliation

The Court now turns to Dunbar's retaliation claims, which Dunbar brings under Title VII and FEPA (Counts One and Two). Compl. ¶¶ 49-50. Both statutes bar employers from retaliating against an employee for "opposing" any unlawful employment practice. 42 U.S.C. § 2000e-3(a); R.I. Gen. Laws § 28-5-7(5). Again, because FEPA uses Title VII's standard to analyze retaliation claims, the Court assesses Dunbar's claims together. See Shoucair v. Brown Univ., 917 A.2d 418, 427 (R.I. 2007).

To make out a prima facie case for retaliation, Dunbar "must show that '(1) []he engaged in protected activity; (2) []he suffered some materially adverse action; and (3) the adverse action was causally linked to [his] protected activity.'" Stratton, 113 F.4th at 41-42 (quoting Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007)). A materially adverse action is one which "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 42 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).

The College argues that Dunbar "has not alleged any facts to support a claim that he engaged in a protected activity." Coll.'s Mot. 13. It also asserts that even if he has adequately alleged

17

that he engaged in a protected activity, he still "fails to plausibly allege that he suffered an adverse employment action at the hands of the College." Id. And again, the College contends that Dunbar's claims are time-barred. Id. at 14-16.

The Complaint alleges that Dunbar reached out to Deputy Chief Croce in May 2021 and a College representative in January 2022, to raise issues of alleged employment discrimination based on race. Compl. ¶¶ 39, 42. His outreach on both occasions counts as protected activity and any retaliatory act would likely fall within the relevant period under both Title VII and FEPA.

But Dunbar's claims falter because he does not allege any materially adverse action resulting from his outreach. After he contacted Deputy Chief Croce, he alleges that the two met to discuss his concerns. Id. ¶ 40. He does not allege that any action was taken against him as a result. Id. And as for his outreach to the College representative, he does not allege any resulting action at all.

This lack of supporting factual content means that Dunbar's claims for retaliation, for either actionable event, are not plausible.

### III. CONCLUSION

For these reasons, the Court concludes that Dunbar has stated plausible claims to relief for his unlawful discrimination claims, but not for his retaliation claims. Accordingly, the claims for

18

retaliation cannot proceed.  The Court thus GRANTS IN PART and DENIES IN PART the College's Motion to Dismiss.

IT IS SO ORDERED.

/s/ W. Smith
_____
William E. Smith
Senior District Judge
Date: June 16, 2025